**In re Joseph C. PALMISANO**

[683 A.2d 1348]

No. 94-045

July 23, 1996. Pursuant to the recommendation of the Professional Conduct Board filed June 10, 1996, and approval thereof, it is hereby ordered that Joseph C. Palmisano, Esq., is disbarred for the reasons set forth in the Board's Final Report attached hereto for publication as part of the order of this Court. A.O. 9, Rule 8E.

## FINAL REPORT TO THE SUPREME COURT

Respondent and bar counsel have agreed by stipulation that respondent should be disbarred from the practice of law in the State of Vermont. The stipulation is based upon his admission that in five separate cases now pending, respondent violated eight different disciplinary rules of the Code of Professional Responsibility. His misconduct included acts of fraud, deceit, misrepresentation, neglect of client matters, failure to carry out his contracts of employment with clients, conduct prejudicial to the administration of justice, impermissible personal involvement in the finances of a client, wrongful commingling of client funds with his own, failure to safeguard client funds, and other conduct which adversely reflects on his fitness to practice law.

We have reviewed the stipulation and believe that disbarment is the appropriate sanction based on the following five cases.

## PCB FILE NO. 93.02

1. Winfred and Cheryl Batchelder sold a home to Frederick Constantini. The sum of $1,409.20 was placed in escrow with Mr. Constantini's attorney, Joseph C. Palmisano, to provide time to determine if water damage would occur. The escrow agreement provided that if there were water problems the escrow agent, respondent, would make payment of the escrow funds directly to the contractor. Under the escrow agreement no payments were to be made directly to the purchaser, respondent's client. The escrow agreement was signed on May 8, 1992 and was to run for a period of 90 days. Shortly after the closing, and in direct violation of the escrow agreement, respondent released the entire escrow fund of $1,409.20 directly to his client.

2. In August 1992 Ms. Batchelder conferred with Mr. Constantini and determined that water damage had occurred and that she wanted $400 of the escrow money to remedy the problem.

3. Unbeknownst to the Batchelders, respondent had already released the escrow funds directly to his client. Respondent contacted his client to return the unauthorized portion of the escrow money, which was done on December 7, 1992.

4. Respondent returned the $1,010 to which the Batchelders were entitled on December 19, 1992.

5. In releasing the Batchelders' money he held in escrow in violation of his responsibilities of escrow agent, respondent violated DR 6-101(A)(3)(neglect of legal matter entrusted.

## PCB FILE NO. 93.45

6. Mr. and Mrs. Wesley Bettis retained respondent to represent them in their personal bankruptcy. Mr. Bettis agreed to pay respondent a fee of $2,000. Some time between March 27 and March 30, 1992, Mr. Bettis paid to respondent an advance fee totaling $1,480. An additional $500 was paid on April 22, 1992.

7. Respondent filed the bankruptcy petition on behalf of Mr. and Mrs. Bettis on May 8, 1992. In that bankruptcy petition respondent falsely stated that he had received $500 as an advance fee from Mr. and Mrs. Bettis, rather than the $1,980 that he had received within the last 90 days.

8. The Vermont National Bank was holding a mortgage on property held by Mr. and Mrs. Bettis. Respondent suggested to Mr. Bettis that if Mr. Bettis would place with respondent in escrow $6,500, respondent could use that amount in an effort to negotiate the payoff of the mortgage with the bank. Mr. Bettis borrowed money from friends and relatives in the amount of $6,000, and gave it to respondent on April 27, 1992.

9. Respondent never approached Vermont National Bank representatives to negotiate a payoff of the mortgage with the $6,000 as leverage.

10. In the bankruptcy petitions filed on behalf of the Bettises, respondent did not reveal, as required, the existence of the $6,000 of Mr. Bettis' that he held in escrow.

11. Mr. Bettis attempted on many occasions to obtain the return of his $6,000 in from respondent. Mr. Bettis received the total of $6,000 in installment payments in December 1992.

12. In failing to reveal to the bankruptcy court advance fees and holdings in escrow in the amount of $7,980, respondent violated DR 1-102(A)(4)(engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). In failing to attempt to obtain the discharge of the Vermont National Bank mortgage, as directed to by his client, respondent vio-

lated DR 7-101(A)(2)(failure to carry out a contract of employment entered into with a client).

## PCB FILE NO. 92.49

13. In August 1991 Arnold Appell, on behalf of Allied Electronics, Inc., hired respondent to represent that corporation in financial matters, which were bleak. Mr. Appell was referred to respondent by a friend of respondent. Respondent did not request a retainer.

14. In early October 1991 Mr. Appell received a $10,000 payment from an account receivable. He called respondent to discuss the payment. At the time Allied Electronics owed an installment on a loan to the bank. Respondent instructed Mr. Appell to send the $10,000 to him and he would use it as a bargaining chip with the bank to work something out. Mr. Appell, upon reflection, agreed to respondent's request. Respondent sent an employee from his office in Berlin, Vermont to Lebanon, New Hampshire that same day, October 3, 1991, to receive the $10,000 cashier's check.

15. Respondent deposited the $10,000 into a personal Joseph C. Palmisano account at Merchant's Bank on October 4, 1991.

16. Respondent also advised Mr. Appell to transfer the registrations of two New Hampshire corporations to Vermont. Mr. Appell gave respondent $600 for the Vermont incorporations fees.

17. Respondent retained New Hampshire counsel to sponsor Allied Electronics' bankruptcy filing in New Hampshire. Respondent told Leonard Appell, Arnold Appell's brother and successor president to the corporation, and New Hampshire counsel that the $10,000 payment made to him by Arnold Appell was for a bond required by the Vermont Secretary of State when the new corporations were registered in Vermont. He said the bond was required since Allied Electronics was so financially insecure.

18. This was a false statement. No bond of any amount was required by or paid to the Vermont Secretary of State for the registration of any Appell corporation.

19. Respondent filed the bankruptcy petition on behalf of Allied Electronics on October 21, 1991. He failed to disclose in his affidavit in support of the Debtor's Motion to Employ that he had received the $10,000 payment two weeks prior to the bankruptcy filing.

20. In early November 1991 Arnold Appell asked respondent to return $5,000 of that payment so that he could meet his payroll obligations. Respondent complied.

21. On October 26, 1992 respondent stipulated with the United States Trustee to return to the debtor's estate the remaining $5,000 payment which he still held.

22. By misrepresenting the $10,000 payment as a bond and by failing to disclose the receipt of this sum to the bankruptcy court, respondent violated DR 1-102(A)(4)(conduct involving dishonesty, fraud, deceit or misrepresentation) and DR 1-102(A)(5)(conduct prejudicial to the administration of justice).

## PCB FILE NO. 93.01

23. In August 1991 Gary Vest, president of Vest Construction, Assoc., retained respondent to file for corporate bankruptcy and represent the corporation in those proceedings. On August 21 and 25, Mr. Vest paid respondent a total of $4,000 as a retainer. Respondent prepared the bankruptcy petition. Shortly thereafter, respondent recommended to Mr. Vest that they engage in a "work-out" process with the corporation's creditors. Mr. Vest agreed.

24. The arrangement between Mr. Vest and respondent was that monies received by Vest Construction from its clients and accounts receivable would be delivered to respondent who would then place the amounts in an escrow account, over which respondent had exclusive withdrawal authority. Vest Construction had only depository authority on this account. When Vest Construction needed money to pay creditors or payroll, Mr. Vest would inform respondent who would then draft a check from the escrow account payable to Vest. The escrow account was set up by respondent as a separate IOLTA account, with interest payable to the Vermont Bar Foundation.

25. Beginning with a check from Mr. Vest dated October 22, 1991 and ending with a third check from Mr. Vest dated October 24, 1991, a total of $84,566.24 was placed by respondent in the Vest IOLTA account. No deposits were made to the Vest IOLTA account after that date.

26. The next Vest check written to respondent after October 24, 1991 was on November 15 for $12,000. The notation on the check was that it was intended for the "Escrow Account." Instead, the entire $12,000 was placed in two separate operating accounts maintained for respondent or his law firm. From November 15, 1991 until May 7, 1992 the total amount of Vest check deposited into respondent's operating accounts was $76,000. One of those ten checks had a notation on it, "Not fee."

27. On October 25, 1991 and October 31, 1991 respondent transferred an additional $19,561.55 out of the Vest IOLTA account to his own operating accounts. Thus, the total amount of Vest money deposited into respondent's operating accounts was $95,561.55

28. Mr. Vest recalls that respondent told him his total fee would be between $10,000 and $12,000. Respondent maintains the oral fee agreement with Mr. Vest

was for $75,000. Even assuming arguendo respondent's version is correct, respondent wrongfully placed $20,561.55 of Vest money into his operating accounts ($95,561.55-$75,000 = $20,561.55).

29. The cash flow system established between Vest Construction and respondent worked from the date of the first disbursement to Vest on October 24, 1991 until May of 1992. Respondent met the cash requests of Mr. Vest twice from the Vest IOLTA account and three times from a Palmisano operating account for a total of $92,284 ($64,784 from Vest IOLTA and $27,500 from Palmisano operating).

30. In April 1992 two checks for $10,000 each, drawn on a Palmisano operating account to Vest, were returned for insufficient funds. These checks were eventually made good.

31. In May 1992 Mr. Vest asked respondent for $5,500 for company expenses. On May 11, respondent wrote a check in that amount from one of his operating accounts and sent it to Mr. Vest. This check was returned for insufficient funds. Mr. Vest asked for an explanation. Respondent told him that the check would be made good. It was not.

32. The last Vest money turned over to respondent by Mr. Vest was on May 7, 1992.

33. From April 1992 through September 1992 respondent or an agent issued ten checks from a Palmisano operating account to or on behalf of Vest Construction. Of those ten, three bounced but were made good ($28,000), four were paid upon presentation ($19,700) and three bounced and were never paid ($20,500).

34. Vest Construction filed for bankruptcy in late December 1992.

35. On August 14, 1992 respondent cosigned a promissory note on behalf of Gary Vest in the amount of $11,000.

36. Respondent and Mr. Vest agree that Mr. Vest paid to respondent a total amount of $160,566.24 and that respondent paid out to Mr. Vest or on his behalf $119,984 — with the resulting balance of $40,528.24 held by respondent. Which party is entitled to that balance is still the subject of dispute because of the disagreement as to respondent's fee for legal services.

37. Notwithstanding Paragraph 36, above, respondent violated DR 9-102(A)(requiring deposit of client funds in a federally insured trust account) by wrongfully commingling monies belonging to Vest Construction with his own funds.

38. In co-signing a promissory note for Gary Vest, a principal of his corporate client, respondent violated DR 5-103(B)(prohibiting lawyers from acquiring a financial interest in client matters by extending financial assistance to them).

## PCB FILE NO. 94.40

39. Respondent consulted with John Doe regarding representation for Mr. Doe in a Connecticut bankruptcy involving the estate of a relative. Mr. Doe decided to retain the services of respondent, an obligation that respondent assumed. In the course of their consultation, respondent suggested to Mr. Doe that he might invest some money in an investment opportunity.

40. Commencing on April 17, 1991 and concluding on May 28, 1991, Mr. Doe paid to respondent, by eight separate checks, a total of $175,000. The check proceeds were to be placed in escrow, to be used for a purchase of land or, alternatively, to be treated as a legal retainer, held in escrow. The "investments," in escrow and otherwise, were to generate financial returns for Mr. Doe, which respondent was to pay to him.

41. Respondent did not perform any legal services on behalf of Mr. Doe.

42. Mr. Doe received from respondent a total of just over $40,000. The payments were made by way of personal checks drawn by respondent on banks in New York or Vermont, third party checks, or cash outlays. Respondent also gave Mr. Doe two other checks, dated July 8, 1992, in the amounts of $10,000 and $15,000. However, there were insufficient funds on deposit to cover payment of those checks.

43. In failing to return Mr. Doe's principal which respondent held in escrow, respondent violated DR 9-102(B)(4) (requiring payment to the client of all funds in the possession of the lawyer which the client is entitled to receive). In failing to place his client's escrow money in a federally insured trust account, respondent violated DR 9-102(A). In failing to make payments, either principal or full interest, after promising to do so, respondent violated DR 1-102(A)(7)(engaging in any other conduct adversely reflecting on his fitness to practice law). Finally, in failing to carry out a contract of employment entered into with Mr. Doe, respondent violated DR 7-101(A)(2).

## RECOMMENDED SANCTION

It is unnecessary to delineate all of the sections of the ABA Standards for Imposing Lawyer Sanctions that compel disbarment in these cases. The four most compelling are:

1) Section 4.11: "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client";

2) Section 6.11: "Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false docu-

ment, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding";

3) Section 5.11: "Disbarment is generally appropriate when a lawyer engages in criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft . . ." and

4) Section 7.11: "Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system"

The aggravating factors are many:

* A dishonest motive;
* A pattern of misconduct;
* Multiple offenses;
* Vulnerability of the victims;
* Substantial experience in the practice of law;
* Indifference to making restitution.

The only mitigating factor is the imposition of other penalties or sanctions.

Accordingly, we recommend to the Vermont Supreme Court that respondent be disbarred from the practice of law.